BILLS BROS. MEMORIAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 1346.   Promulgated August 30, 1927.

Amount of invested capital determined.

*William H. Dickson, Esq.,* for the petitioner.
*W. H. Lawder, Esq.,* for the respondent.

This is an appeal from the determination of a deficiency of $1,822.76 in income taxes for the year 1919. It is alleged that the

Commissioner erred (1) in reducing petitioner's invested capital, and (2) allowing insufficient depreciation for the taxable year.

FINDINGS OF FACT.

Petitioner is a Colorado corporation with principal offices at Denver, organized in January, 1918, for the purpose of acquiring the assets of the Bills Brothers Monumental Co., also a Colorado corporation with principal offices at Denver.

The Monumental Co. was incorporated in 1908 and was engaged in the business of supplying granite and marble markers or monuments for the graves of deceased persons. Approximately 90 per cent of its business was obtained through agencies established by it throughout the States of Wyoming, Nebraska, Kansas, Oklahoma, New Mexico, Arizona, Utah, Idaho, and Colorado. The company supplied the agents with samples of granite and marble, photographs of monuments or markers, catalogues, stationery, advertising matter and a case for carrying the equipment. A representative of the company would visit the agents, and, in the case of a new agent, would spend several days training and familiarizing him with the business. The cost of establishing an agency was approximately $100, which included all samples, etc., supplied and the expenses of the company's representative, the latter item constituting the major portion of such cost. The company had 219 agents in the latter part of 1917. The agents were not employees of the company, but received a commission on orders sent in to the company. Upon the withdrawal of an agent the samples and other supplies, as a rule, were not returned to the company. More than 20 per cent of the agencies were lost to petitioner during the taxable year.

Prior to June 1, 1917, the Monumental Co. had a capital stock of $10,000, and on that day increased its authorized capital to $30,000, divided into 30,000 shares of $1 par value each. The increase was based upon an alleged earned surplus consisting of cash in the bank, supplies on hand, and agencies established, the latter item being valued at approximately $25,000 of the total $30,000 capital. Of the increased capital there were issued 15,000 shares to Charles R. Slusser, for which he paid $6,000, evidenced by his note in that amount, 14,985 shares to H. C. Hefner, and 5 qualifying shares to each of three employees, the last mentioned 15 shares belonging in fact to Hefner. In December, 1917, or January, 1918, Slusser negotiated with Simon Bitterman for the sale of Hefner's half interest to Julius Wallbrunn, it being understood that Wallbrunn and Slusser would each give 1,000 shares of stock to Bitterman as a commission. As a result of these negotiations Hefner received $11,000 cash, $10,000 from Wallbrunn and $1,000 from Slusser, the cash

balance and accounts receivable of the company, for which he assumed the liabilities of the company and transferred his half interest to Wallbrunn. Before final completion of the transaction it was decided to organize a new corporation to take over the business.

Petitioner was incorporated about the middle of January, 1918, with 30,000 shares of capital stock, par value $1 each. Pursuant to an agreement between the parties, 14,000 shares were issued to Wallbrunn and 6,000 shares were issued to Slusser in consideration of the assets and business of the Monumental Co., exclusive of the cash balance and the accounts receivable, and free from all liability; Slusser gave 100 of his 6,000 shares to Hefner; and 10,000 shares were issued to Bitterman in consideration of $2,000 cash, the establishment of a $15,000 line of credit with the bank, and services rendered.

The assets of the Monumental Co., exclusive of accounts receivable and cash in bank, consisted of a stock of marble and granite, machinery and fixtures, and agencies and equipment. The merchandise cost $5,151 while the company valued the agencies and equipment at approximately $25,000 and the machinery and fixtures at $1,036. The petitioner, in taking over these assets, valued the merchandise at its replacement cost, based upon current market prices, as of the date acquired and made an adjustment in the agencies and equipment account. Petitioner's assets and its valuation thereof, as appears from the opening entry upon its books, were:

| | | |
|---|---:|---:|
| First National Bank, Denver (cash on hand) | | $2,000 |
| Merchandise: | | |
| In store | $6,405 | |
| In warehouse | 783 | |
| | | 7,188 |
| Machinery and fixtures | | 1,036 |
| Equipment (printed matter, etc.) | | 2,493 |
| Agencies' equipment | | 17,283 |
| To capital stock | | 30,000 |

The respondent adjusted petitioner's invested capital, reducing the merchandise account to $5,151 and the combined equipment and agencies' equipment accounts (totaling $19,776) to $4,813, and determined invested capital to be $13,000.

OPINION.

VAN FOSSAN: Petitioner was incorporated for the purpose of taking over the assets and business of a predecessor corporation, but from an examination of the stockholdings of the two corporations it appears that there was not a 50 per cent interest or control in the business remaining in the same persons. In the valuation of its assets for invested capital purposes therefore, petitioner is not limited by the provisions of section 331 of the Revenue Act of 1918.

The principal item in controversy is the valuation of the asset termed " equipment and agencies' equipment." It consisted of some two hundred agencies which supplied petitioner and its predecessor with orders for its product and received a commission as compensation. The bulk of the business was obtained through these agents, to whom the company furnished the necessary equipment. The predecessor company valued this item at approximately $25,000, upon the basis of which it increased its capital stock from $10,000 to $30,000 on June 1, 1917, and petitioner at the time of the reorganization, valued it at $19,776. The basis of these valuations does not clearly appear. Some tangible equipment, the value of which is not shown with definiteness, was supplied, but the bulk of the cost of establishing these agencies consisted of the expenses of the company's representative incurred in visiting them, which was clearly not a capital expenditure, but rather a current business expense. The real value of these agencies to the company was in the business produced by them. They can not be said to be a tangible asset, but are rather in the nature of good will. It is evident that when the company increased its capital in 1917 upon the basis of its valuation of these agencies, it was attempting to capitalize the good will of the business.

When petitioner acquired the business it set up in its accounts a value for these agencies and equipment in the sum of $19,776. The value of the good will attached to a trade or business, when clearly established, may properly be included as intangible property, with certain limitations, in the computation of invested capital. In this case, however, no adequate proof of the value of these agencies, the good will of the business, is submitted. No evidence was offered that would form a proper basis for a valuation of this asset  There is no definite proof of the receipts, expenses, earnings, or other essential facts of either the petitioner or its predecessor over a period of years, which are necessary to any proper valuation of the good will of a business. We have only an approximated figure of what they cost the predecessor to establish.

Even though petitioner had established the value claimed for such agencies, the ultimate relief sought, viz, depreciation thereon, could not be allowed, since they consisted chiefly of the good will of the business, and good will is not a depreciable asset. (See *Red Wing Malting Co.* v. *Willcuts*, 15 Fed. (2d) 626; *Appeal of Manhattan Brewing Co.*, 6 B. T. A. 952.) The respondent has allowed a value of $4,813 for equipment and agencies equipment in his computation of invested capital. We are not advised of the basis of this valuation, but since it appears that some tangible property was supplied to the agents, and since the petitioner has failed to establish a higher

valuation than that allowed by respondent, we will not disturb the computations of respondent so far as this item is concerned.

The other item in controversy, the merchandise stock, cost the predecessor company $5,151, which is the amount allowed by respondent, apparently upon the theory that section 331 of the 1918 Act applied. At the time acquired by petitioner the replacement cost of this merchandise was $7,188, at which figure it valued this item in its computation of invested capital. Since we have held that section 331 is not applicable, petitioner is entitled to include the merchandise in invested capital at its actual cash value. (See section 326(a)(2), 1918 Act.) The cost of this merchandise to the petitioner, which was paid for in stock, was $7,188, based upon current market prices, and, we think, fairly represents the actual cash value, which should be allowed in the computation of invested capital. The respondent erred in reducing the value of this item in his computation of invested capital.

It is further alleged that the respondent erred in refusing to allow the sum of $3,727.96 for exhaustion, wear and tear (including obsolescence), but this allegation is in reality a corollary of the error assigned in the reduction of invested capital, and is disposed of by our decision of that issue, no question having been raised as to the rate of depreciation applied by respondent.

Petitioner's invested capital and the allowance for depreciation should be recomputed in accordance with this opinion.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by MARQUETTE, MILLIKEN, and PHILLIPS.