BETTY J. SHACKELFORD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shackelford v. Commissioner
Docket No. 13183-92
United States Tax Court
T.C. Memo 1994-271; 1994 Tax Ct. Memo LEXIS 268; 67 T.C.M. (CCH) 3088; June 13, 1994, Filed *268 For petitioner: Roderick L. MacKenzie. For respondent: Daniel J. Parent. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined a deficiency in petitioner's Federal income tax for 1988 in the amount of $ 28,873 and additions to tax for that year under sections 6653(a) and 6661(a) in the amounts of $ 1,444 and $ 7,125, respectively. [1]
The issues remaining for decision are: (1) Is petitioner entitled to a deduction for amounts claimed paid to outside consultants? We hold that she is not. (2) Is petitioner entitled to a deduction for claimed travel expenses? We hold that she is not. (3) Is petitioner's dividend income to be increased by $ 2,162? We hold that it is. (4) Is petitioner's interest income to be increased by $ 179.64? We hold that it is. (5) Is petitioner liable for the addition to tax for *269 negligence under section 6653(a)? We hold that she is. (6) Is petitioner liable for the addition to tax for a substantial understatement of income tax under section 6661(a)? We hold that she is. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time petitioner filed her petition in this case, she resided in Roseville, California. Petitioner was married to Richard Maynard (Maynard) during 1988. Her correct filing status for 1988 is "Married Filing Separate", and not "Single" as she claimed in the Federal income tax return she filed for that year. On May 22, 1985, prior to their marriage on May 23, 1985, petitioner and Maynard executed a prenuptial agreement in which they defined the "respective rights of each in the property, income, assets, and liabilities that each may have or may acquire" and agreed that: except as may be expressly set forth * * * [in this prenuptial agreement], all property, real and personal, owned by either of them at the time of the contemplated marriage, from whatever source, shall remain the respective separate property of the person acquiring the property, and neither shall acquire any interest or right to any *270 of the other property of the other. The parties agree that there shall be no community property. All personal property and real property acquired during the marriage shall be the separate property of the person acquiring it. All earnings and accumulations shall be the separate property of the party who earns it. Each party expressly waives any community property interest in the earnings, accumulations and property, of whatever nature, acquired by the other party during marriage.
On November 5, 1985, petitioner filed with the recorder of Placer County, California, an inventory of her separate property, listing both her assets and liabilities. Petitioner is a certified rehabilitation counselor who focuses on vocational rehabilitation. During 1988, petitioner operated Shackelford Vocational Rehabilitation Services as a sole proprietorship (hereinafter referred to as either petitioner's business or her business). One-third to one-half of the clients of petitioner's business are Hispanic. One aspect of petitioner's job as a vocational rehabilitation counselor is to help workers injured on the job to find new employment. Her services sometimes involve helping injured workers, *271 some of whom are illegal aliens, to establish new businesses in Mexico. During 1988, Maynard was a partner with William McDonald (McDonald) in Maynard & McDonald (M&M), an accounting firm. A checking account in the name of Maynard & McDonald Trust (trust account) was maintained at the Bank of Alex Brown. Maynard and McDonald held the trust account as co-trustees, with each having signature authority. Funds deposited into the trust account were not included in the income of M&M. The books and records maintained for petitioner's business reflect the following amounts that were shown as consulting expenses paid by her business to, or on behalf of, the following individuals or businesses: [2]
Individual/Business
Amount
Maynard
$ 43,404.00
Linda Beymer
2,223.54
Nacho Orosco
1,292.00
Spanish Interservices
26.57
Agness Gregory
50.00
Juan Jacques
2,058.86
Olivia Yniques
80.00
Daria Lisizin
600.00
Bonnie Gardner
987.65
TOTAL
$ 50,722.62
*272 Checks written on an account in the name of petitioner's business that was maintained at the Marysville, California office of Wells Fargo Bank reflect amounts paid to, or on behalf of, Maynard, as follows: Check # Amount
Payee Disposition 1554
$  3,500
Maynard
Deposited 2/3/88, Bank of Alex Brown
in the trust account
1641
3,500
Maynard
Deposited 4/18/88 in the trust account
1655
3,500
Maynard
Deposited 4/18/88 in the trust account
1656
754
IRS
Applied to Maynard's 1987 Federal income tax
1686
3,500
Maynard
Deposited 5/9/88 in the trust account
1708
3,500
Maynard
Deposited 5/24/88 in the trust account
1783
3,500
Maynard
Deposited 8/2/88 in the trust account
1796
3,500
Maynard
Deposited 8/10/88 in the trust account
1798
3,500
Maynard
Deposited 8/16/88 in the trust account
1861
500
Maynard
Cashed Wells Fargo Bank
1923
3,500
Maynard
Deposited 11/16/88 in the trust account
1924
3,500
Maynard
Deposited 11/16/88 in the trust account
1925
150
Maynard
Cashed Wells Fargo Bank
1969
3,500
Maynard
Deposited 12/20/88 in the trust account
1970
3,500
Maynard
Deposited 12/28/88 in the trust account
TOTAL
$ 43,404
*273 Petitioner and Maynard did not enter into a written agreement regarding any consulting services to be performed by Maynard or any fees to be paid to him. In the Schedule C (Profit or (Loss) from Business or Profession) attached to her 1988 return (Schedule C), petitioner reported $ 137,975 in gross receipts and $ 136,468 in net gross receipts from her business. To determine gross receipts, petitioner reduced net cash receipts of $ 164,011 [3] *274 that were reflected in the books of her business by $ 26,036 that consisted of "travel" expenses in the amount of $ 3,390 and "consultant" expenses in the amount of $ 22,646. To determine net gross receipts, petitioner reduced gross receipts of $ 137,975 by $ 1,507 of "returns and allowances". To determine gross income, petitioner reduced net gross receipts of $ 136,468 by $ 28,077 that was shown in Schedule C as a cost of goods sold and/or operations relating to "outside services". [4] For 1988, petitioner reported a net profit from her business of $ 20,725. Petitioner and Maynard traveled to Mexico and Guatemala during the period October 14, 1988, to November 2, 1988 (the Mexico trip). Petitioner produced receipts with respect to the Mexico trip that show air transportation, bus transportation, hotels, and meals for two people totaling $ 1,464, $ 50, $ 335.76, and $ 68.45, respectively. In response to interrogatories submitted by respondent, petitioner provided an itinerary for the Mexico trip that was not prepared contemporaneously with the dates of the Mexico trip and that listed the places in Mexico and Guatemala to which she and Maynard traveled. On June 1, 1987, the Clamper Investment Club (Clamper) opened an investment account (Clamper account) with Bateman Eichler, Hill Richards, Inc. (BEHR). In response to a question regarding the manner in which BEHR acquired the Clamper account *275 that appeared in the BEHR new account information form used in opening that account, Maynard was shown as the individual who referred Clamper to BEHR. On June 2, 1987, petitioner signed a Form W-9 (Payer's Request for Taxpayer Identification Number and Certification) on behalf of Clamper. On September 9, 1987, petitioner, her son, and her daughter executed a power of attorney listing Maynard as the "agent and attorney-in-fact" of Clamper in dealings with BEHR. On December 3, 1990, petitioner, her son, and her daughter executed a power of attorney listing petitioner as the "agent and attorney-in-fact" of Clamper in dealings with BEHR. Clamper did not file any type of tax or information return for 1988. During 1988, dividends paid on the Clamper account totaled $ 2,162. Neither Maynard nor petitioner reported the $ 2,162 in dividends in their respective 1988 returns. [5]
On October *276 11, 1988, petitioner withdrew $ 18,750 from the Clamper account. This was the only cash withdrawal from the Clamper account during 1988. During 1988, interests held for Clamper in certain money market funds that were reflected in the Clamper account were sold, and the proceeds were reinvested in other investment funds. During 1988, the following deposits were made into the Clamper account: Date
Amount
Source
2/5/88
$  3,500
Check written on the trust account
2/5/88
5,000
Cashier's check purchased at Bank of Alex Brown
4/20/88
7,000
Check written on the trust account
4/20/88
4,045
Cashier's check purchased at Bank of Alex Brown
5/26/88
3,500
Check written on the trust account
6/2/88
3,500
Check written on the trust account
8/22/88
3,375
Check written on the trust account
8/22/88
3,037
Check written on the trust account
11/16/88
7,000
Check written on the trust account
11/30/88
179
Interest on loan to the McIsaacs
12/30/88
3,500
Check written on the trust account
TOTAL
$ 43,636
In correspondence dated October 13, 1988 (October 13 correspondence), James A. and Norma Jean McIsaac applied for a loan of $ 75,000 from petitioner, Mary Charles *277 McDonald, Mary Lee Sharer, and Gold Country Financial, Inc.[6] (Hereinafter, the last three persons listed are referred to as the three other creditors.) The McIsaacs indicated in the October 13 correspondence that they planned to use the borrowed money to pay various loans and expenses, including two real estate loans and $ 7,000 owed to their accountants M&M, and to provide working capital for their business, The Jimmy Inn. Petitioner and the three other creditors lent the McIsaacs $ 68,000 in cash. For reasons not adequately explained in the record, the $ 7,000 that the McIsaacs owed M&M was added to the $ 68,000 in cash lent to them by petitioner and the three other creditors, and a total of $ 75,000 was reflected in a promissory note payable by the McIsaacs to petitioner and the three other creditors (the McIsaac Note) and in a deed of trust executed by the McIsaacs in favor of those four persons. Cash in the amount *278 of $ 18,750 was lent in petitioner's name as her portion of the $ 75,000 debt reflected in the McIsaac Note. The McIsaac Note was dated October 14, 1988, was due October 24, 1998, provided for interest at the rate of 11.5 percent, and was made payable to the following: Betty J. Shackelford, a married woman as her sole and separate property as to an undivided 1/4 interest and Mary Lee Sharer, a widow as to an undivided 1/4 interest and Mary Charles McDonald, a married woman as her sole and separate property as to an undivided 1/4 interest and Gold Country Financial, Inc., a California corporation as to an undivided 1/4 interest.
First American Title Insurance Company (First American) handled the McIsaac Note transaction. On October 11, 1988, petitioner executed a power of attorney giving McDonald the right to "sign and approve instructions in escrow #10002851 at the Auburn office of First American * * *." In that power of attorney, petitioner acknowledged that that "escrow involves a loan from the undersigned [petitioner] and three other parties [the three other creditors] to James and Norma McIsaac for their business The Jimmy Inn." In late November 1988, the McIsaacs *279 paid $ 718.50 in interest on the McIsaac Note. On November 28, 1988, the $ 718.50 payment was deposited into the trust account. On November 28, 1988, four checks, each in the amount of $ 179.64, were written on the trust account. One of the four checks was deposited into the Clamper account on November 30, 1988. Neither Maynard nor petitioner reported the $ 179.64 in interest in their respective 1988 returns. OPINION 1. Burden of Proof
Petitioner bears the burden of proving that respondent's determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). She has attempted to satisfy her burden through testimonial and documentary evidence. In particular, petitioner relies heavily on her own self-serving testimony and that of Maynard. We had the opportunity to observe the demeanor of petitioner and Maynard and did not find them to be credible. We also found their testimony to be vague and evasive in certain material respects. In these circumstances, we are not required to, and do not, accept their testimony. See Ruark v. Commissioner, 449 F.2d 311, 312 (9th Cir. 1971), *280 affg. per curiam T.C. Memo. 1969-48; Clark v. Commissioner, 266 F.2d 698, 708-709 (9th Cir. 1959), affg. and remanding T.C. Memo. 1957-129; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). 2. Amounts Paid to Maynard and Others
Petitioner claims that she is entitled to deduct under section 162(a)(1) $ 50,722.62 in consulting fees. [7] *281 Of the total amount claimed, $ 43,404 was paid to Maynard and the remaining $ 7,318.62 was paid to Linda Beymer, Nacho Orosco, Spanish Interservices, Agness Gregory, Juan Jacques, Olivia Yniques, Daria Lisizin, and Bonnie Gardner (hereinafter sometimes referred to as the others). [8]
Respondent contends that petitioner has not provided an adequate explanation of the business purpose for any of those payments. With respect to the $ 43,404 paid to Maynard, respondent also argues that that sum is not reasonable *282 in amount. [9]
*283 Focusing on the $ 43,404 paid to Maynard, respondent notes that (1) no credible evidence was produced describing any services provided by Maynard that warranted his receipt of $ 43,404; (2) during an interview with Arthur Pease, a revenue agent assigned to the audit of petitioner's 1988 return, petitioner described Maynard as her bookkeeper; (3) petitioner and Maynard did not enter into a written agreement regarding any consulting services to be performed by, or any fees to be paid to, Maynard; (4) no evidence was adduced that Maynard produced any written product in his capacity as a consultant to petitioner's business; (5) petitioner did not report the $ 50,722.62 in payments to Maynard and the others as consulting expenses in the Schedule C filed for 1988, and instead reduced her net cash receipts by $ 22,646 for "consultant" expenses and reflected the remaining $ 28,077 as a cost of goods sold and/or operations tied to "outside services"; and (6) petitioner did not provide evidence that Maynard received a Form 1099 or W-2 from her business or herself. Deductions are a matter of legislative grace, and a taxpayer seeking a deduction must meet every condition that Congress has imposed *284 for entitlement to the deduction claimed. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Section 162 generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The determination of whether an expenditure satisfies the requirements of deductibility under section 162 is a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943); Hearn v. Commissioner, 309 F.2d 431, 431 (9th Cir. 1962), affg. 36 T.C. 672 (1961). In general, an expense is ordinary if it is considered "normal, usual, or customary" in the context of the particular business out of which it arose. Deputy v. du Pont, 308 U.S. 488, 495-496 (1940). Ordinarily, an expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985). *285 Even if an expense is ordinary and necessary, it is deductible under section 162 only to the extent it is reasonable in amount. E.g., United States v. Haskel Engineering & Supply Co., 380 F.2d 786, 788-789 (9th Cir. 1967); Commissioner v. Lincoln Electric Co., 176 F.2d 815, 817 (6th Cir. 1949), revg. a Memorandum Opinion of this Court dated Oct. 27, 1947. In deciding whether an expense is ordinary and necessary within the meaning of section 162, courts generally have focused on the existence of a reasonably proximate relationship between the expense and the taxpayer's business and the primary motive or purpose for incurring it. E.g., Greenspon v. Commissioner, 229 F.2d 947, 954-955 (8th Cir. 1956), affg. on this issue and revg. in part 23 T.C. 138 (1954); Henry v. Commissioner, 36 T.C. 879, 884 (1961); Larrabee v. Commissioner, 33 T.C. 838, 841-843 (1960). In general, where an expenditure is primarily associated with profit-motivated purposes, and personal benefit can be said to be distinctly secondary *286 and incidental, the expenditure may be deducted under section 162. E.g., International Artistis, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970); Sanitary Farms Dairy, Inc. v. Commissioner, 25 T.C. 463, 467-468 (1955); Rogers Dairy Co. v. Commissioner, 14 T.C. 66, 73 (1950). Conversely, if an expenditure is primarily motivated by personal considerations, no deduction for it will be allowed. E.g., Henry v. Commissioner, supra;Larrabee v. Commissioner, supra.A taxpayer's general statement that her expenses were incurred in pursuit of a trade or business is not sufficient to establish that the expenses had a reasonably direct relationship to that trade or business. Ferrer v. Commissioner, 50 T.C. 177, 185 (1968), affd. per curiam 409 F.2d 1359 (2d Cir. 1969). Petitioner relies heavily on her own testimony and that of Maynard to substantiate the business purpose for the $ 43,404 paid to Maynard. We did not find either witness to be credible. Petitioner also relies on the testimony *287 of McDonald to substantiate the business purpose for the $ 43,404 paid to Maynard. McDonald's testimony, which was general in nature and at times vague, did not establish the business purpose for the payments to Maynard. [10] McDonald did not testify at all regarding the type of services Maynard provided to or on behalf of petitioner and her business. He also was unable to testify with any degree of specificity as to the number of hours spent by Maynard in providing services to petitioner and her business. *288 It is also significant that the vast majority of the payments made to Maynard during 1988 were in the amount of $ 3,500, were paid approximately monthly, and did not appear to be linked to particular services, if any, that Maynard provided to petitioner's business. [11]
Based on the record before us, we hold that petitioner has failed to establish that she is entitled to deduct under section 162(a)(1) $ 43,404 paid to or on behalf of Maynard during 1988. Consequently, respondent's determination disallowing a deduction for that amount is sustained. [12]
*289 Although petitioner produced accounting records of her business showing payments totaling $ 7,318.62 to Linda Beymer, Nacho Orosco, Spanish Interservices, Agness Gregory, Juan Jacques, Olivia Yniques, Daria Lisizin, and Bonnie Gardner, she adduced no evidence to substantiate the business purpose for any portion of those payments.[13] *290 Petitioner did not provide evidence that any of those persons received a Form 1099 or W-2 from her business or herself. No witness in this case testified as to the nature or amount of the services performed by those persons on behalf of petitioner and her business. None of those persons was presented as a witness in this case. [14] We may therefore presume that their testimony would not have been favorable to petitioner's position that amounts remitted to them represented deductible consulting fees. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). On the instant record, we find that petitioner has failed to establish her right to deduct under section *291 162(a)(1) $ 7,318.62 paid during 1988 to Linda Beymer, Nacho Orosco, Spanish Interservices, Agness Gregory, Juan Jacques, Olivia Yniques, Daria Lisizin, and Bonnie Gardner. We therefore sustain respondent's determination disallowing a deduction for amounts paid to those persons. 3. Travel Expenses
Citing Commissioner v. Flowers, 326 U.S. 465 (1946), petitioner contends that she is entitled to deduct under section 162(a)(2) travel expenses she incurred for the Mexico trip because those expenses were (1) reasonable and necessary travel expenses, (2) incurred while away from home, and (3) incurred in the pursuit of her business. Petitioner further asserts that the presence of Maynard on the Mexico trip served a bona fide business purpose and that therefore the travel expenses related to his presence also are deductible under section 1.162-2(c), Income Tax Regs.
Respondent primarily argues that petitioner may not deduct any travel expenses for 1988 because she has failed to meet the record-keeping requirements of section 274(d). [15] Respondent also contends that (1) petitioner's records are inadequate for purposes of making an allocation between *292 business and nonbusiness expenses as required by section 274(c)[16] *293 for travel outside the United States that exceeds one week; [17] (2) petitioner's meal expenses are subject to the 80-percent limitation on meals and entertainment pursuant to section 274(n); and (3) petitioner has failed to justify the expenses of Maynard in accompanying her on the Mexico trip. Section 162(a)(2) allows a deduction for all ordinary and necessary travel expenses paid by a taxpayer during the taxable year while traveling away from home in pursuit of a trade or business. An otherwise allowable travel expense deduction is disallowed if the taxpayer does not satisfy the substantiation requirements of section 274(d) through either adequate records or the taxpayer's own detailed statement that is corroborated by sufficient evidence. Sec. 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46016-46017 (Nov. 6, 1985); Meridian Wood Products Co. v. United States, 725 F.2d 1183, 1189 (9th Cir. 1984). In order to be entitled to deduct otherwise deductible expenses for travel, section 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014-46015 (Nov. 6, 1985), places on petitioner the burden to substantiate: (1) The amount for each separate expenditure for traveling away from home, such as cost of transportation or lodging, *294 except that the daily cost of the traveler's own breakfast, lunch, and dinner and of expenditures incidental to such travel may be aggregated, if set forth in reasonable categories, such as for meals, for gasoline and oil, and for taxi fares; (2) the dates of departure and return for each trip away from home and the number of days away from home spent on business; (3) the destination or locality of travel, described by name of city or town or other similar description; and (4) the business reason for travel or nature of the business benefit derived or expected to be derived as a result of travel. We agree with respondent that petitioner has not satisfied the substantiation requirements of section 274(d). Of the claimed "travel" expenses of $ 3,390, petitioner has provided receipts for only $ 1,918.21 in expenses incurred with respect to the Mexico trip for air transportation, bus transportation, hotels, and meals for two people. Thus, of the $ 3,390 in claimed travel expenses, there is no evidence at all with respect to $ 1,471.79. With respect to the $ 1,918.21 in travel expenses for which petitioner produced receipts, we find that she has not substantiated the business purpose *295 underlying those expenses. Petitioner did not introduce any contemporaneous account book, diary, or similar record in which she recorded at or near the time she incurred those expenses the business purpose for her having incurred them. [18] See sec. 1.274-5T(c)(2)(ii), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). Nor were the receipts themselves annotated with information regarding the business purpose for her incurring the expenses. Instead, petitioner sought to establish the business purpose underlying the $ 1,918.21 in expenses for Maynard and herself for which she produced receipts through her own testimony and that of Maynard. The Court did not find either petitioner or Maynard to be credible. On the instant record, petitioner *296 is not entitled to deduct the claimed $ 3,390 in travel expenses. We therefore sustain respondent's determination with respect to those expenses. [19]
4. Dividend Income
Petitioner argues that the $ 2,162 in dividends paid during 1988 on the Clamper account was not taxable to her because "she did not own this account and was only a nominee for Richard Maynard." She notes that Maynard testified that (1) the money in the account was his; (2) he asked petitioner and her children to be on the account in order that the money would be theirs if something happened to him; and (3) he acknowledged that the dividends *297 from the account were his income. Respondent argues that the dividends in question are taxable to petitioner because "petitioner opened the account, controlled the account and no other taxpayer reported the dividends." In so arguing, respondent points out that (1) petitioner signed documents on behalf of Clamper in whose name the Clamper account was opened; (2) the names of petitioner and her two children were the only names on the account; (3) petitioner made the only cash withdrawal from the account during 1988 -- a withdrawal of $ 18,750 on October 11, 1988; (4) Clamper did not file any tax or information returns during 1988; and (5) Maynard did not report the dividends at issue in his 1988 tax return. Although both petitioner and Maynard testified that the Clamper account was an account belonging to Maynard and that the dividends paid on that account in 1988 were income to Maynard, [20] we did not find them to be credible. *298 Petitioner testified that, by filing the inventory of her separate property on November 5, 1985, she was attempting to make clear the separation in ownership of her assets and those of Maynard. Nonetheless, she claims that she held assets of Maynard in her name as his nominee. It seems to us that petitioner's holding assets as nominee for Maynard would tend only to confuse, rather than make clear, the separation in ownership of her assets and those of Maynard. Based on the instant record, petitioner has failed to carry her burden of proving that she is not taxable on the $ 2,162 in dividends paid during 1988 on the Clamper account. Accordingly, we sustain respondent's determination to include those dividends in her income for that year. [21]
*299 5. Interest Income
Petitioner contends that she did not lend the McIsaacs any money, that she was a mere nominee for Maynard on the McIsaac Note, and that she had no ownership interest in the McIsaac Note. She argues that therefore she is not required to include in her income for 1988 the $ 179.64 in interest paid on the McIsaac Note and deposited into the Clamper account during that year. Respondent asserts that petitioner's income for 1988 includes the interest in question, pointing out that (1) on October 11, 1988, petitioner withdrew $ 18,750 from the Clamper account, which is the amount lent to the McIsaacs in petitioner's name on October 14, 1988; (2) the McIsaac Note provided for the payment of principal and interest to "Betty J. Shackelford, a married woman as her sole and separate property as to an undivided 1/4 interest," and the three other creditors; (3) on November 28, 1988, the McIsaacs' check in the amount of $ 718.50 was deposited into the trust account; (4) a check written on the trust account for $ 179.64, which is approximately one-fourth of $ 718.50, was deposited into the Clamper account; and (5) Maynard did not report the $ 179.64 in interest income *300 in his 1988 tax return. Despite evidence in the record reflecting her ownership interest in the McIsaac Note, petitioner attempts to disavow any interest in that note by relying primarily on her own testimony and that of Maynard. We did not find their testimony to be credible. Petitioner also relies on the testimony of McDonald who stated that he had received $ 18,750 from Maynard, which was then loaned to the McIsaacs in petitioner's name pursuant to Maynard's instructions. [22] No testimony was elicited from McDonald that shows that he knew the source of the money given to him by Maynard. [23]
*301 On the instant record, petitioner has not established that she did not lend the McIsaacs $ 18,750 and that $ 179.64 in interest paid on the McIsaac Note and deposited into the Clamper account during 1988 is not taxable to her. Accordingly, we sustain respondent's determination to include that interest in her income for that year. 6. Additions to Tax for Negligence
Section 6653(a) provides that if any part of any underpayment of tax required to be shown in a return is due to negligence or disregard of rules or regulations, an amount equal to five percent of the entire underpayment is to be added to the tax. On brief, petitioner concedes that her failure to report certain gross receipts in the Schedule C for 1988 and her claiming on that same schedule certain disallowed office, meals and entertainment, and utilities and telephone expense deductions were due to negligence. However, she argues that the addition to tax for negligence under section 6653(a) applies only to the portion of the underpayment of tax that is attributable to negligence. Petitioner is wrong. Sec. 6653(a). In light of petitioner's concession that at least a portion of the underpayment for 1988 was *302 due to negligence, petitioner is liable for the addition to tax under section 6653(a) on the entire underpayment of tax for that year. 7. Addition to Tax for Substantial Understatement of Income Tax
Respondent determined that petitioner is liable for 1988 for the addition to tax under section 6661(a). That section imposes an addition to tax equal to 25 percent of the underpayment attributable to a substantial understatement of income tax. An understatement generally exists where the amount of tax shown in the taxpayer's return is less than the amount required to be shown in his or her return. Sec. 6661(b)(2)(A). In the case of an individual, an understatement is substantial where it exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown in the taxpayer's return. Sec. 6661(b)(1)(A). Excepting items atrributable to tax shelters, the amount of the understatement is reduced by items with respect to which the taxpayer had substantial authority for his or her position or for which relevant facts affecting tax treatment were adequately disclosed. [24]Sec. 6661(b)(2)(B). *303 Petitioner concedes that her failure to report certain gross receipts in the Schedule C for 1988 and her claiming on that same schedule certain disallowed office, meals and entertainment, and utilities and telephone expense deductions result in her liability for the addition to tax under section 6661(a) only with respect to those items. Petitioner argues that her reporting positions with respect to the deductions she claimed for 1988 for the amounts paid to Maynard and the others and for "travel" expenses and her failure to include in her income for that year the dividends paid on the Clamper account and the interest from the McIsaac Note were supported by substantial authority. Respondent argues that those reporting positions were not supported by substantial authority. In order to satisfy the substantial authority standard of section 6661(b)(2)(B)(i), petitioner must show that the weight of authorities supporting her position is substantial in relation to those supporting a contrary position. Sec. 1.6661-3(b)(1), Income Tax Regs.; Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990). *304 Although the standard is less stringent than the "more likely than not" standard, it is stricter than the "reasonable basis" standard that usually is sufficient to prevent imposition of the addition to tax for negligence. Sec. 1.6661-3(a)(2), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. Id. A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to relevant facts. Sec. 1.6661-3(b)(3), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. Sec. 1.6661-3(b)(1), Income Tax Regs.
In effect, petitioner argues that, under the facts as she would have us believe them to be, she had substantial authority to support her return position on the items still in dispute. We have not accepted petitioner's rendition of the facts because (1) we did not believe her or Maynard and/or (2) petitioner failed to introduce evidence of pertinent *305 facts establishing her position as to the issues in dispute. On the instant record, we conclude that petitioner failed to show that she had substantial authority for her return positions with respect to the issues in dispute. Accordingly, we sustain respondent's determination that petitioner is liable for 1988 for the addition to tax under section 6661(a). To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Our use herein of the words "consulting", "consultant", and similar terms is for convenience only and does not necessarily reflect our view as to the nature of the services, if any, provided by Maynard and others to petitioner and her business.↩
3. To determine net cash receipts, petitioner made the following calculation: ↩
Cash receipts -- 1988
$ 164,383 Add Ending A/R (12/31/88)
10,791 Less Ending A/R (12/31/87)
(11,163)
Net cash receipts
$ 164,011 4. The sum of $ 22,646 for "consultant" expenses and $ 28,077 for "outside services" is $ 50,723, the total amount paid to Maynard, Linda Beymer, Nacho Orosco, Spanish Interservices, Agness Gregory, Juan Jacques, Olivia Yniques, Daria Lisizin, and Bonnie Gardner.↩
5. The record does not disclose whether petitioner's children reported any of those dividends in their respective 1988 tax returns.↩
6. Mary Charles McDonald is the former wife of McDonald, and Mary Lee Sharer is his daughter.↩
7. In determining the gross income of her business for 1988, petitioner subtracted, inter alia, a total of $ 50,722.62 in consulting fees from her gross receipts. At trial and in her opening brief, petitioner no longer advances the position that that amount can be subtracted to determine the gross income of her business. Instead, she argues that that amount is an ordinary and necessary expense of her trade or business deductible under section 162(a)(1)↩. In her answering brief, petitioner does note that McDonald testified about the manner in which she subtracted the $ 50,722.62 in consulting fees to determine the gross income of her business for 1988. In any event, we find that petitioner has not established that the $ 50,722.62 was paid for services provided to her business.
8. Respondent addresses on brief and petitioner addresses in her answering brief the propriety of petitioner's claim that the entire $ 50,722.62 in consulting expenses is a deductible expense. We thus decide the deductibility of that amount, although we note that petitioner asserts in her opening brief that only $ 49,430 of that amount remains in dispute in this case. She bases that assertion on a statement to that effect appearing in respondent's trial memorandum. In agreeing in her trial memorandum that only $ 49,430 in consulting expenses remains in dispute, respondent asserted that she was relying on a concession of petitioner. However, petitioner asserts in her opening brief that it was respondent who made the concession. Although petitioner contends that the alleged concession relates to amounts paid to Bonnie Gardner, nothing in the record verifies that contention.↩
9. In her opening brief, respondent contends that most of the payments made to Maynard were deposited into the trust account and then withdrawn within a short period of time from that account and redeposited into the Clamper account. Respondent argues that petitioner should not be entitled to a deduction for amounts paid to Maynard from which she obtained a benefit and over which she maintained control. In her answering brief, petitioner contends that the amount and timing of Maynard's deposits into the trust account varied significantly from the amount and subsequent timing of deposits into the Clamper account. After examining the amount and timing of Maynard's deposits of checks he received from petitioner's business for consulting services and the amount and timing of deposits into the Clamper account on checks written on the trust account, we find that there is a substantial circular flow of funds from petitioner's business to Maynard, from Maynard to the trust account, and from the trust account to the Clamper account. That circular flow of funds makes it appear that petitioner was attempting to generate deductions for amounts from which she obtained a benefit and over which she maintained control.↩
10. It is noteworthy that McDonald testified that the purpose for the trust account was to hold funds for clients of M&M. Yet, he also testified that he used that account to pay bills for his daughter after her husband died. We also note that Maynard appeared to use the trust account for personal reasons. In this regard, he deposited into the trust account checks he received from petitioner's business for consulting services. The use of the trust account for reasons other than the handling of the funds of clients of M&M detracts from the reliability of McDonald's testimony regarding the purpose for the trust account and leads us to question his credibility.↩
11. No payments of $ 3,500 were made during February, June, or September of 1988. However, two $ 3,500 payments were made either on the same day or within a few days of each other during each of the months March, August, and December.↩
12. Maynard testified that he prepared an accounting record for petitioner's business regarding cash receipts and accounts receivable and wrote some payroll checks on behalf of petitioner and her business. He also testified that his son prepared other accounting records for petitioner's business. After carefully examining the accounting records that Maynard stated he and his son had prepared, we found the handwriting on those records to be very similar. Consequently, we cannot be certain whether Maynard or his son had prepared any or all of those accounting records. Maynard's son did not testify on petitioner's behalf, and we thus assume that his testimony would not have been favorable to petitioner's position in this case. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). On the instant record, petitioner has provided no evidence by which we can estimate the time Maynard devoted to, or the value of, any accounting or payroll services he may have provided to petitioner's business. See Cohan v. Commissioner, 39 F.2d 540↩ (2d Cir. 1930).
13. Among the stipulated receipts that the parties represented at trial related solely to air and bus transportation, meals, and hotel expenses arising from the Mexico trip is a receipt in the amount of $ 50 reflecting a payment from petitioner's business to Daria Lisizin for "job development". No explanation or testimony regarding that receipt was proffered. Without more explanation, we do not believe that receipt substantiates a business purpose for any amount paid to Daria Lisizin.↩
14. On brief, petitioner notes that in her trial memorandum respondent indicated that she intended to call Bonnie Gardner (Ms. Gardner) as a witness. In her trial memorandum, respondent stated that Ms. Gardner was to be called to testify about petitioner's marital status and Maynard's services to petitioner's business; respondent did not state that Ms. Gardner was going to be questioned concerning the purpose for which she received money from petitioner's business. Ms. Gardner was not called as a witness at trial. We will not treat respondent's failure to call Ms. Gardner as creating a presumption that the testimony she would have given regarding the purpose for which she received money from petitioner's business would have been adverse to respondent's position. Petitioner bears the burden of introducing evidence to support her position that payments to Ms. Gardner had a business purpose. See Wichita Terminal Elevator Co. v. Commissioner, supra↩ at 1165.
15. Respondent does not argue that the travel expenses are not ordinary and necessary business expenses or that they are unreasonable in amount.↩
16. The restrictions of sec. 274(c)(1) apply only if (1) the travel expense is otherwise deductible under sec. 162 or 212; (2) the expense is for travel away from home outside the United States that exceeds one week; and (3) the time away from home outside the United States attributable to nonbusiness activity constitutes 25 percent or more of the total travel time. Sec. 274(c)(2); sec. 1.274-4(b), Income Tax Regs. Generally, the restrictions of sec. 274(c)(1) require that the travel expenses be apportioned between days of business activity and days of nonbusiness activity. Sec. 1.274-4(d)(2), (f)(1), Income Tax Regs.↩
17. The Mexico trip lasted from Oct. 14, 1988, to Nov. 2, 1988.↩
18. Although petitioner testified at trial that she maintained a business diary, she did not attempt to introduce that diary into evidence because she claimed that it would disrupt business relationships with her clients and insurance companies.↩
19. We agree with respondent that if petitioner's meal expenses were otherwise allowable business expenses, they would be subject to the 80-percent limitation on meals and entertainment pursuant to sec. 274(n)(1). We also note that petitioner's records are inadequate for purposes of deciding whether sec. 274(c)↩ applies in the first instance or making an allocation between business and nonbusiness expenses.
20. Petitioner testified that she was a mere nominee for the Clamper account and that that account belonged to Maynard. As support for that assertion, petitioner relies on Exhibit 22, a document that lists Maynard as the "agent and attorney-in-fact" of Clamper in dealings between Clamper and BEHR. The fact that that document designates Maynard as the agent and attorney-in-fact of Clamper does not establish an ownership interest of Maynard in the Clamper account.↩
21. Petitioner does not argue that any portion of the dividends at issue is taxable to her children, and not to her. We therefore deem her to have conceded that her children held no beneficial interest in the Clamper account. See Rybak v. Commissioner, 91 T.C. 524, 566↩ (1988).
22. Here again, petitioner's claim that she held an interest in the McIsaac Note only as a nominee for Maynard is not consistent with her expressed desire to separate the ownership of Maynard's assets and her own.↩
23. In response to questioning from respondent's counsel regarding his receipt of $ 18,750 that was lent in petitioner's name to the McIsaacs, McDonald testified: "I received money that belonged to Mr. Maynard." He further testified that Maynard's payment was in the form of a cashier's check. McDonald's testimony does not establish the source of the $ 18,750 that Maynard provided to McDonald.↩
24. Petitioner does not argue that adequate disclosure was made in her 1988 return of any of the items comprising the understatement of tax for that year. We therefore conclude that petitioner concedes that she did not make adequate disclosure that would have shielded her from liability under sec. 6661(a)↩.